Filed 3/1/21  In re J.R. CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| In re J.R., a Person Coming Under the Juvenile Court Law. | B308011 (Los Angeles County Super. Ct. No. 19CCJP04130) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>J.V.,<br><br>    Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, D. Brett Bianco, Judge.  Affirmed.

Vincent Uberti, under appointment by the Court of Appeal, for Defendant and Appellant.

Rodrigo A. Castro-Silva, County Counsel, Kim Nemoy, Assistant County Counsel, and Brian Mahler, Deputy County Counsel, for Plaintiff and Respondent.

———————————

The Los Angeles County Department of Children and Family Services (DCFS) initiated juvenile dependency proceedings concerning then-seven-month-old J.R. The juvenile court later sustained an amended dependency petition alleging that J.R.'s mother's substance abuse posed a substantial risk of serious physical harm to J.R., and that J.R.'s father failed to protect J.R. from this risk. Although the juvenile court initially released J.R. to his parents' custody, it later sustained a supplemental petition under Welfare and Institutions Code section 387,[1] removed J.R. from mother and father, and ordered father to submit to a psychiatric evaluation.

Father appeals each of these rulings, and further argues that the juvenile court and DCFS violated their duty to inquire whether J.R. is or may be an Indian child for the purposes of the Indian Child Welfare Act of 1978 (ICWA) (25 U.S.C. § 1901 et seq.) and its related state law provisions.

---

[1] Undesignated statutory citations are to the Welfare and Institutions Code. Section 387 provides in pertinent part: "An order changing or modifying a previous order by removing a child from the physical custody of a parent . . . and directing placement in a foster home . . . shall be made only after noticed hearing upon a supplemental petition. [¶] . . . The supplemental petition shall be filed by the social worker in the original matter and shall contain a concise statement of facts sufficient to support the conclusion that the previous disposition has not been effective in the . . . protection of the child . . . ." (See § 387, subds. (a)–(b).)

We reject father's challenges to the ruling sustaining the supplemental petition and the removal order because substantial evidence shows that father and mother prevented DCFS from assessing whether their home was safe for J.R. We also uphold the juvenile court's order requiring father to submit to a psychiatric evaluation because the lower court reasonably suspected that father's domineering behavior interfered with the agency's ability to conduct a home assessment. Lastly, father's ICWA claim fails because father identifies only one source of relevant information concerning J.R.'s potential status as an Indian child, the paternal grandmother (PGM), and substantial evidence shows that PGM refused to speak with DCFS's employees. We thus affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

We summarize only those facts that are relevant to this appeal.

1. ***The dependency petition, the non-detain report, and the July 1, 2019 detention hearing***

On June 28, 2019, DCFS filed a juvenile dependency petition alleging jurisdiction over J.R. under section 300, subdivisions (a) and (b)(1).[2] In particular, the petition alleged

---

[2] Section 300, subdivision (a) provides that dependency jurisdiction is proper if "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm inflicted nonaccidentally upon the child by the child's parent or guardian." (§ 300, subd. (a).) As pertinent here, subdivision (b)(1) authorizes a juvenile court to exercise jurisdiction if "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as

that on May 28, 2019, mother pushed maternal grandmother (MGM), twisted MGM's fingers, and caused MGM to sustain a nasal fracture (counts a-1 and b-2); and mother had "a history of substance abuse and is a current abuser of amphetamine, methamphetamine and alcohol, which render[ed] the mother incapable of providing regular care and supervision of the child," and father "knew of the mother's substance abuse and failed to protect the child in that the father allowed the mother to reside in the child's home and to have unlimited access to the child" (count b-1). Attached to the petition was an ICWA-010(A) Indian child inquiry attachment form, which was completed by a social worker and indicated that mother reported that J.R. "has no known Indian ancestry."

Accompanying the petition was a "non-detained detention report."[3] (Boldface and capitalization omitted.) On May 28, 2019, mother reported to DCFS that she had been "sad and depressed about" the fact that approximately one month prior, she and father "broke up and decided to live apart from each other for a while." She claimed that on the night of the incident in which "she grabbed MGM['s] hands and pushed her away," mother "had [a] couple of beers."

a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child, . . . or by the inability of the parent or guardian to provide regular care for the child due to the parent's . . . substance abuse." (See *id.*, subd. (b)(1).)

[3] The remainder of this paragraph and the following two paragraphs summarize relevant aspects of the non-detain detention report.

4

Mother agreed to take a drug test and on June 6, 2019, the test results indicated the presence of amphetamine and methamphetamine. When DCFS informed mother of the drug test results on June 7, 2019, mother admitted to using methamphetamine several weeks earlier at a friend's house, and mother claimed that she left J.R. in MGM's care on that day. During that interview, mother reiterated that "she was stressed," and stated that father "left her and did not want to be with her." The non-detain detention report also noted that mother had been arrested on April 11, 2017 and October 8, 2018 for driving under the influence of alcohol.

On June 7, 2019, father told DCFS that he knew that "mother has a problem with drinking," but he claimed "he never knew that the mother was using drugs." At DCFS's request, mother entered an in-patient substance abuse treatment program on June 17, 2019; J.R. accompanied mother to the program's facilities. Mother received negative test results for drug tests conducted on June 17 and 25, 2019.

Prior to the detention hearing held on July 1, 2019, father filed an ICWA-020 parental notification of Indian status form, wherein father indicated he "may have Indian ancestry" but the name of the tribe to which his ancestors may have belonged was "[u]nknown."

The juvenile court asked father at the July 1, 2019 detention hearing why he believed he had Indian ancestry, and father replied that his parents stated "they have Indian blood in them." After father indicated that PGM was still alive and that she may have additional information regarding this issue, the juvenile court ordered DCFS to contact PGM and "to more fully explore with [father] any additional information he may have."

Nonetheless, the court found that, "[w]ithout any more specific information, . . . it ha[d] no reason to know ICWA applies to this case." The court also found a prima facie showing that J.R. was a person described by section 300, allowed J.R. to remain in his parents' custody on the condition that mother continue to have negative drug test results, ordered DCFS to provide family preservation services to J.R. and his parents, and ordered the parents to make J.R. available for unannounced home visits.

2.      ***The August 5, 2019 jurisdiction/disposition report and the August 19, 2019 adjudication hearing***

On August 5, 2019, DCFS filed a jurisdiction/disposition report.[4] On July 24, 2019, mother, who at that time was 35 years old, stated that she had used methamphetamine on a daily basis from the ages of 29 to 31, and, at the age of 31, she became a heavy alcohol drinker. Mother claimed to have ceased using methamphetamine on a daily basis "two summers ago," and to have consumed the substance only twice since then. Mother said that the last time she used methamphetamine was on the night of her physical altercation with MGM, and that she had consumed alcohol on that evening as well. She also claimed that although father was not aware that she was drinking alcohol, he suspected that was the case because he could smell the substance on her.

On July 26, 2019, father conceded that he suspected mother had been drinking alcohol, but he stated he " 'was not going to judge her' " and " '[s]he was never slurring or not looking

---

[4] The remainder of this paragraph and the following paragraph summarize relevant aspects of the August 5, 2019 jurisdiction/disposition report.

6

normal.' " "Father indicated that he did not have any knowledge that mother had used methamphetamines and continues to be in disbelief"; "[f]ather stated that he believed mother had stopped using" the drug. Additionally, although father once again acknowledged that "PGM had mentioned that she possibly had Indian Ancestry," he "refused to provide" DCFS with "PGM['s] contact information, and indicated that he did not want PGM to be involved."

At the adjudication hearing held on August 19, 2019, the juvenile court reiterated that it did not "have a reason to know that ICWA applies." The court dismissed counts a-1 and b-2, but sustained a version of count b-1 that was amended to allege that mother was a "recent abuser of amphetamine, methamphetamine and alcohol," as opposed to a "current abuser" of those substances. The court declared J.R. a dependent of the court, authorized him to remain in his parents' custody, and approved a case plan that required: (1) mother to complete a full drug and alcohol program, submit to weekly and random drug and alcohol tests, take a developmentally appropriate parenting class, and participate in individual counseling to address case issues; and (2) father to attend meetings at an Alcoholics Anonymous program. Significantly, the court ordered both parents to make the child available for unannounced home calls and "keep DCFS advised of [their] addresses and telephone/cell phone numbers."

### 3. *The February 8, 2020 status report and the February 18, 2020 review hearing*

DCFS filed a status report on February 8, 2020.[5] Since mother was discharged from an in-patient substance abuse treatment program on November 14, 2019, J.R. has been under the care of his mother and father. On November 18, 2019, J.R.'s parents reported that they were homeless, and that the family spent their nights in shelters and in the homes of friends and family members.

"During monthly interviews with both parents, [DCFS personnel] witnessed both parents arguing with each other. While mother was still residing at [her in-patient substance abuse treatment program], the mother texted the following [to a social worker] on 10/12/19: 'I need your assistance and help. . . . My child's father is being verbally abusive to me. I worry he will not return the baby when he wants him.' " When a social worker met with the parents at a DCFS office on January 8, 2020, mother and father started arguing because "father complained that he had to do services ordered by the court"; those remarks had "upset" mother because she stated that father "is expected to support his family."

On February 18, 2020, the juvenile court held a review hearing pursuant to section 364.[6] The court found that

---

[5] The remainder of this paragraph and the following paragraph summarize relevant aspects of the February 8, 2020 status report.

[6] Section 364 governs review hearings held after "an order is made placing a child under the supervision of the juvenile court pursuant to Section 300 and in which the child is not removed from the physical custody of his or her parent or

"[c]ontinued jurisdiction [was] necessary because conditions exist[ed] which justify jurisdiction," and that DCFS provided reasonable services to meet J.R.'s needs. The court instructed DCFS to provide family maintenance services to J.R. and his parents, ordered the parents to "continue to participate in their programs," and declared that its prior "Order of Home of Parents remain[ed] in full force and effect."

4. ***The protective custody warrant, the supplemental petition, the August 3, 2020 detention report, and the August 6, 2020 detention hearing***

On July 27, 2020, DCFS filed an application seeking an order removing J.R. from his parents' custody because mother and father did not allow DCFS to conduct a safety assessment of J.R.'s home. The juvenile court granted the application and issued a protective custody warrant later that day.

On August 3, 2020, DCFS filed a supplemental petition pursuant to section 387. The supplemental petition alleged two counts: (1) mother failed to comply with juvenile court orders to (a) make J.R. and his home available to be assessed by DCFS and (b) submit to weekly and random/on-demand drug and alcohol testing (count s-1); and (2) father failed to comply with juvenile court orders to (a) make J.R. and his home available to be

_____

guardian . . . ." (See § 364, subd. (a).) "At a section 364 review hearing, '[t]he court shall terminate its jurisdiction unless the social worker or his or her department establishes by a preponderance of evidence that the conditions still exist which would justify initial assumption of jurisdiction under Section 300, or that those conditions are likely to exist if supervision is withdrawn.' [Citation.]" (*In re D.N.* (2020) 56 Cal.App.5th 741, 755, fn. 10.)

9

assessed by DCFS and (b) participate in Alcoholics Anonymous meetings (count s-2).

Also on August 3, 2020, DCFS filed a detention report.[7] From November 14, 2019 to April 7, 2020, the parents did not provide a physical address to DCFS, but they continued to bring J.R. to the DCFS office for monthly visits. During these monthly interviews with the parents, mother often "refused to be interviewed individually" and stated that she does not keep secrets from father. In March 2020, a DCFS social worker tried to discuss the minor's safety with mother, and she responded: " 'He will be upset I am telling you anything I have to delete these messages right now' "; the text message itself does not explicitly identify the person that mother referred to as "[h]e" therein. On April 1, 2020, when a DCFS social worker called mother to discuss her case plan, "father answered the phone and started yelling at [the social worker]."

On April 7, 2020, both parents provided MGM's address as their residential address, and DCFS assessed the home on April 10, 2020. In May 2020, "the parents tried hard" to meet with a DCFS social worker in a location other than the minor's home, "such as a clinic or a business place," although mother ultimately "agreed to meet" with a social worker at MGM's home. DCFS did not visit J.R.'s home in June 2020.

On July 13, 14, 16, and 17, 2020, a DCFS social worker called and text messaged the parents to schedule an appointment to visit J.R. at his home, and mother and father did not respond to the agency. On July 17, 2020, the social worker contacted

---

[7] The remainder of this paragraph and the following four paragraphs summarize relevant aspects of the August 3, 2020 detention report.

mother's drug treatment center's instructor, who provided a new telephone number for mother. Later that day, the social worker called mother at this new telephone number and told mother that the worker needed to make an appointment for a home visit; "mother responded[, ']I will call you later[, '] and hung up . . . ." The social worker then sent a text message to mother to schedule an appointment, and mother stated that she would meet the social worker at DCFS's office at 3:00 p.m. The social worker reiterated that the social worker "would need to see child [J.R.] at his home to assess his safety." When the social worker sent the mother a text message again on July 20, 2020 to schedule an appointment for a home assessment, mother did not respond to that message.

On July 21, 2020, DCFS personnel went to MGM's home and spoke with maternal grandfather, who stated that mother and J.R. were not in the home but they were still living there. On July 27, 2020, a social worker text messaged both parents to schedule an appointment for the following day to interview the family, and, although mother responded " 'ok' " and added a thumbs-up image to the text response, the parents did not attend their scheduled appointment. On July 28, 2020, DCFS employees went to MGM's home to serve the warrant to detain J.R., but no one answered the front door. On July 30, 2020, a social worker and one or more police officers traveled to MGM's home, located J.R., and took him into protective custody pursuant to the removal warrant.

Additionally, DCFS claimed that mother failed to report for a random drug test on July 17, 2020, and that father "has not followed through with" the Alcoholics Anonymous services ordered by the juvenile court.

11

The juvenile court held a detention hearing on August 6, 2020. The court ordered DCFS to detain J.R. in shelter care pending the next hearing and authorized mother and father to have monitored visits with the child, although mother and father were barred from visiting the child together.

5. ***The September 9, 2020 jurisdiction/disposition report and the September 21, 2020 hearing on the supplemental petition***

DCFS filed a jurisdiction/disposition report on September 9, 2020.[8] On August 27, 2020, father told DCFS "his child was 'kidnapped' and that he did not believe that truthful information was presented in the Detention Report." Mother failed to participate in two scheduled telephone appointments with DCFS, and, as a consequence, the agency was unable to interview mother in connection with the jurisdiction/disposition report. Mother missed drug tests on August 6 and 10, 2020, but she received a negative result for her August 20, 2020 drug test.

On September 21, 2020, the juvenile court held a hearing on the supplemental petition. At the outset of the hearing, the court admitted into evidence the August 3, 2020 detention report and the September 9, 2020 jurisdiction/disposition report, and took "judicial notice of the case file and its contents . . . ." The court thereafter sustained both counts of the supplemental petition, and found that "the previous disposition [was] ineffective in ensuring the safety of the child."

Next, the juvenile court removed J.R. from his parents' custody, and approved a case plan that, among other things,

---

[8] The remainder of this paragraph summarizes relevant aspects of the September 9, 2020 jurisdiction/disposition report.

12

required: (1) mother to submit to random or on-demand drug tests; and (2) father to (a) participate in Alcoholics Anonymous meetings, (b) submit to a psychiatric evaluation pursuant to Evidence Code section 730,[9] and (c) participate in individual counseling. In the course of ordering father to submit to the psychiatric evaluation, the court remarked: "The court believes and agrees with the assessment that there is more to this dysfunctional family than meets the eye, and we need to figure out what that is. I think I can take a guess—there's power and control issues involved."

On September 28, 2020, father timely appealed the findings and rulings issued at the September 21, 2020 hearing.[10]

_____

[9] Evidence Code section 730 provides in pertinent part: "When it appears to the court, at any time before or during the trial of an action, that expert evidence is or may be required by the court or by any party to the action, the court on its own motion or on motion of any party may appoint one or more experts to investigate, to render a report as may be ordered by the court, and to testify as an expert at the trial of the action relative to the fact or matter as to which the expert evidence is or may be required." (Evid. Code, § 730.)

[10] The notice of appeal identifies the order being challenged as follows: "On 09/21/2020 the Court found the 387 petition to be true and removed the child from the parents." DCFS argues that this description does not confer upon us jurisdiction to review the order requiring father to submit to a psychiatric evaluation. We hold that, liberally construed, the notice of appeal encompasses this ruling, notwithstanding the fact that father did not specifically identify each and every aspect of the September 21, 2020 order that he intended to challenge. (See *In re J.F.* (2019) 39 Cal.App.5th 70, 75 ["A notice of appeal shall be ' "liberally construed so as to protect the right of appeal if it is *reasonably clear* what [the] appellant was trying to appeal

## DISCUSSION

### A. Substantial Evidence Supports the Juvenile Court's Decision to Sustain the Supplemental Petition

"Under section 387, DCFS may bring a supplemental petition for an order changing or modifying a previous order by removing a child from the physical custody of a parent. [Citation.] 'A section 387 petition is ordinarily required when the petitioner . . . seeks to modify a dispositional order by establishing the need for a "more restrictive level" of custody.' [Citation.] DCFS 'has the burden to show by a preponderance of the evidence that the factual allegations alleged in the petition are true. If the court finds the factual allegations are true, then the court determines whether the previous disposition is no longer effective in protecting the child . . . .' [Citation.]" (*In re A.O.* (2010) 185 Cal.App.4th 103, 109–110 (*A.O.*).)

"We review an order sustaining a section 387 petition for substantial evidence." (*A.O.*, *supra*, 185 Cal.App.4th at p. 109.) " ' " 'In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court.' [Citation.] 'We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court.' " ' " (*In re S.R.* (2020) 48 Cal.App.5th 204, 219 (*S.R.*).)

_____

from, and where the respondent could not possibly have been misled or prejudiced." ' [Citation.]"].)

14

Father argues that "[s]ubstantial evidence . . . does not support a finding that the parents failed to make [J.R.'s] home available to DCFS" because mother and father "still made [the minor] available for in-home visits a large majority of the time"— i.e., 11 out of the 12 months in which the case had been pending at that point.

Assuming arguendo that mother and father failed to make J.R. available for a home assessment in only the month of July 2020, there still is substantial evidence establishing that placement with the parents "has not been effective in the . . . protection of the child . . . ." (See § 387, subd. (b).) The August 3, 2020 detention report indicates that from July 13, 2020 to July 30, 2020, DCFS attempted to schedule an assessment of the minor's home, but during that time, one or both of the parents failed to respond to DCFS's telephone calls or text messages, to agree to schedule an appointment for the home visit, and to show up for a scheduled appointment.[11] Furthermore, dependency jurisdiction over the minor was established on account of mother's substance abuse and father's failure to protect J.R. therefrom, meaning the juvenile court had found that absent its and DCFS's supervision, the parents posed a substantial risk of serious physical harm to J.R. (See § 300, subd. (b)(1).) In addition, father does not challenge the juvenile

---

[11] Father argues that "DCFS is at least partly to blame for not seeing [J.R.] [in July 2020] because [the agency] declined an appointment with the family." This assertion is misleading. Although mother arguably offered to meet a social worker at a *DCFS office* on July 17, 2020, the social worker responded by "remind[ing] the mother that [the social worker] would need to see child [J.R.] *at his home* to assess his safety." (Italics added.)

court's finding that mother had failed to submit to drug testing (as alleged in count s-1 of the supplemental petition).

Given J.R.'s very young age (i.e., 20 months old in July 2020), and the fact that for more than two weeks, J.R.'s parents repeatedly failed to allow DCFS to assess the minor's home to determine whether mother's substance abuse and father's obliviousness thereto threatened his safety, we conclude that substantial evidence supports the juvenile court's finding that placement with the parents has not been effective at protecting the child.[12] (*In re Drake M.* (2012) 211 Cal.App.4th 754, 766–767 [" '[C]ases finding a substantial physical danger tend to fall into two factual patterns. One group . . . . involves children of such tender years that the absence of adequate supervision and care poses an inherent risk to their physical health and safety. [Citations.]' [Citation.]"].)

Father also challenges the juvenile court's ruling sustaining the allegation that he failed to attend Alcoholics Anonymous meetings. As discussed below, we decline to reach this issue.

"As a general rule, a single jurisdictional finding supported by substantial evidence is sufficient to support jurisdiction and render moot a challenge to the other findings.[13] [Citation.] We

_____

[12] Father maintains that "DCFS provided no evidence of harm to [J.R.], aside from some relatively minor medical issues which the parents obtained treatment for." "We reject [this] argument out of hand because ' "[t]he court need not wait until a child is seriously abused or injured to assume jurisdiction and take the steps necessary to protect the child." ' [Citations.]" (*S.R.*, *supra*, 48 Cal.App.5th at p. 219.)

[13] With regard to section 387 petitions, " '[t]he ultimate "jurisdictional fact" necessary to modify a previous placement

16

nonetheless retain discretion to consider the merits of a parent's appeal [citation], and often do so when the finding '(1) serves as the basis for dispositional orders that are also challenged on appeal [citation]; (2) could be prejudicial to the appellant or could potentially impact the current or future dependency proceedings [citations]; or (3) "could have other consequences for [the appellant], beyond jurisdiction" [citation].' [Citations.]" (*In re M.W.* (2015) 238 Cal.App.4th 1444, 1452 (*M.W.*).)

Father does not identify any reason why we should exercise our discretion to review the juvenile court's ruling that he failed to attend Alcoholics Anonymous meetings. Nor do we. We need not review this finding so that father may avoid being deemed an offending parent because we have already concluded substantial evidence supported the juvenile court's finding that both parents failed to make J.R. available for a home assessment. (*In re Quentin H.* (2014) 230 Cal.App.4th 608, 613 ["[W]hen . . . the outcome of the appeal could be 'the difference between father's being an "offending" parent versus a "non-offending" parent,' a finding that could result in far-reaching consequences with respect to these and future dependency proceedings, we find it appropriate to exercise our discretion to consider the appeal on the merits."].)

Additionally, father does not challenge the dispositional rulings to the extent they hinge on the validity of the juvenile court's finding that he failed to participate in Alcoholics Anonymous meetings. (See *M.W.*, *supra*, 238 Cal.App.4th at p. 1452 [noting that an appellate court may reach the merits of

---

with a parent or relative is that the previous disposition has not been effective in the protection of the minor.' [Citation.]" (*A.O.*, *supra*, 185 Cal.App.4th at p. 110.)

an otherwise moot jurisdictional challenge if the finding "serves as the basis for dispositional orders that are also challenged on appeal"].) Accordingly, we affirm the juvenile court's jurisdictional findings vis-à-vis the supplemental petition without passing upon this issue.

## B. Substantial Evidence Supports the Juvenile Court's Order Removing J.R. from His Parents' Custody

Under section 361, subdivision (c)(1), "[a] dependent child shall not be taken from the physical custody of his or her parent . . . with whom the child resides at the time the petition was initiated, unless the juvenile court finds clear and convincing evidence . . . [¶] [that t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . physical custody." (See § 361, subd. (c)(1).)

" '[A]ppellate review of the sufficiency of the evidence in support of a finding requiring clear and convincing proof must account for the level of confidence this standard demands. . . . [W]hen reviewing a finding that a fact has been proved by clear and convincing evidence, the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true. Consistent with well-established principles governing review for sufficiency of the evidence, in making this assessment the appellate court must view the record in the light most favorable to the prevailing party below and give due deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and

18

drawn reasonable inferences from the evidence.' [Citation.]" (*In re V.L.* (2020) 54 Cal.App.5th 147, 155 (*V.L.*), quoting *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 995–996.)

Father claims that "any lack of contact or visits between the parents, [J.R.], and DCFS is due to the parents' housing problems," and that father's and mother's poverty alone cannot support the juvenile court's removal order. Father does not cite any evidence to support this claim.

Furthermore, his argument does not address the parents' failure to inform DCFS in July 2020 that they had a new telephone number, or their failure to return the agency's telephone calls and text messages or attend the appointment they scheduled with DCFS for July 28, 2020. Although mother and father claimed not to have a physical address from November 14, 2019 to April 7, 2020, father does not allege, let alone identify any evidence showing, that he and mother lacked access to a working telephone in July 2020. Rather, the evidence in the record suggests the following: At an unspecified point in time prior to July 17, 2020, J.R.'s parents stopped using the telephone number they had given to DCFS in April 2020; in July 2020, the agency was unsuccessful in its attempts to contact J.R.'s parents at their old telephone number because they violated a court order requiring them to apprise DCFS of any change in telephone numbers; and, after DCFS obtained a new telephone number for mother, she responded to several (but seems to have ignored many) of DCFS's text messages during that month. Given that J.R was a very young child, DCFS rightfully could be concerned if it lost contact with J.R. because his parents failed to keep DCFS apprised of a new telephone

19

number at which they could be reached and mother ignored DCFS's text messages.

Additionally, as we found in Discussion part A, *ante*, there is substantial evidence that for nearly two and a half weeks, mother and father prevented DCFS from ascertaining whether their toddler lived in a safe home environment, even though the juvenile court found that without DCFS and court supervision, the toddler's parents posed a substantial risk of serious physical harm to him. Without being able to access J.R. in his home environment, "a reasonable trier of fact could have found it highly probable that placement of [J.R.] with [mother and] father would pose a substantial risk of [him] being harmed by [mother's substance abuse and father's apparent indifference thereto], and that there were no reasonable means to protect [J.R.] without removal from [his parents'] physical custody." (See *V.L.*, *supra*, 54 Cal.App.5th at pp. 156–157.) We thus affirm the removal order.

## C. The Juvenile Court Did Not Clearly Abuse Its Discretion in Ordering Father to Submit to a Psychiatric Examination

" 'The juvenile court has broad discretion to determine what would best serve and protect the child's interests and to fashion a dispositional order accordingly. On appeal, this determination cannot be reversed absent a clear abuse of discretion. [Citation.]' " (*In re Briana V.* (2015) 236 Cal.App.4th 297, 311–312 [applying this standard in reviewing an order requiring a father to attend counseling].) The parties agree that the clear abuse of discretion standard applies to the court's dispositional order requiring father to submit to a psychiatric evaluation under Evidence Code section 730.

20

The record contains evidence supporting the juvenile court's suspicion that father's domineering behavior may have prevented DCFS from conducting a home assessment in July 2020. In October 2019, mother reported to DCFS that father was " 'verbally abusive' " toward her, and in January 2020, "father complained that he had to do services ordered by the court . . . ." In March 2020, a DCFS social worker tried to discuss the minor's safety with mother, and mother responded: " 'He will be upset I am telling you anything I have to delete these messages right now.' " A reasonable factfinder could infer that mother used the male pronoun "he" to refer to father because mother and father were living together at that time. In April 2020, father "yell[ed]" at a social worker over the telephone. In August 2020, father complained that DCFS had " 'kidnapped' " J.R., even though the agency had a warrant authorizing it to remove the child from his parents' custody. Thus, the juvenile court did not clearly abuse its discretion by ordering father to submit to an examination to determine whether and, if so, to what extent, father's overbearing disposition interfered with the court's attempts to safeguard the minor.

Father counters that " 'power and control issues' . . . . are common to dependency cases and certainly not 'sufficiently beyond common experience that the opinion of an expert would assist the trier of fact.' " We reject this assertion because father does not cite any authority establishing that a judicial officer is presumptively capable of ascertaining the psychological cause(s) of, and potential solutions for, a parent's aberrant behavior. (See Evid. Code, § 801, subd. (a) ["If a witness is testifying as an expert, his testimony in the form of an opinion is limited to such an opinion as is: [¶] . . . [r]elated to a subject that is *sufficiently*

beyond common experience that the opinion of an expert would *assist* the trier of fact," italics added].) Indeed, father concedes that the psychiatric evaluation could "tell the court the source of those [power and control] issues."

In sum, the juvenile court did not err in ordering father to submit to a psychiatric evaluation.

## D. The Juvenile Court and DCFS Did Not Violate Their Duty to Inquire Whether J.R. Is or May Be an Indian Child

" 'ICWA reflects a congressional determination to protect Indian children and to promote the stability and security of Indian tribes and families by establishing minimum federal standards a state court must follow before removing an Indian child from his or her family. [Citations.] For purposes of ICWA, an "Indian child" is an unmarried individual under age 18 who is either a member of a federally recognized Indian tribe or is eligible for membership in a federally recognized tribe and is the biological child of a member of a federally recognized tribe. [Citations.]' [Citation.]" (See *In re A.M.* (2020) 47 Cal.App.5th 303, 314–315 (*A.M.*).)

Under "section 224.2, subdivision (a), . . . the court and child protective agencies remain under 'an affirmative and continuing duty to inquire whether a child . . . is or may be an Indian child.' That duty to inquire begins with initial contact [citation] and obligates the juvenile court and child protective agencies to ask all relevant involved individuals whether the child may be an Indian child.' [Citations.]" (*In re T.G.* (2020) 58 Cal.App.5th 275, 290 (*T.G.*).) "In addition, [California Rules of Court], rule 5.481(a)(4) mandates further inquiry if a social worker or investigator 'knows or has reason to know or believe

22

that an Indian child is or may be involved.' " (*T.G.*, at p. 291.) "[T]he requisite 'further inquiry' 'includes: . . . interviewing the parents and extended family members . . . ." (*In re Austin J.* (2020) 47 Cal.App.5th 870, 883 (*Austin J.*); see also Cal. Rules of Court, rule 5.481(a)(4)(A) [same].) Further, "[n]otice to a[n Indian] tribe is required, under federal and state law, when the court knows or has reason to know the child *is* an Indian child." (*A.M.*, *supra*, 47 Cal.App.5th at p. 315.)

At the September 21, 2020 hearing on the supplemental petition, the juvenile court made no explicit finding that DCFS had discharged its duty to inquire into whether J.R. is an Indian child. Nonetheless, the court is deemed to have made this finding, given that it had "an affirmative and continuing duty to inquire whether a child for whom a petition under Section 300 . . . has been filed[ ] is . . . an Indian child," and it did not order DCFS to further investigate J.R.'s status. (See § 224.2, subd. (a); cf. *A.M.*, *supra*, 47 Cal.App.5th at pp. 318, 320 [concluding that, at the hearing at which the juvenile court issued the order being appealed, the court implicitly found that ICWA did not apply]; *Austin J.*, *supra*, 47 Cal.App.5th at p. 885 ["[A] finding [that ICWA does not apply] implies that . . . social workers had fulfilled their duty of inquiry."].)

"We review a court's ICWA findings for substantial evidence. [Citations.] 'We must uphold the court's orders and findings if any substantial evidence, contradicted or uncontradicted, supports them, and we resolve all conflicts in favor of affirmance.' [Citation.] . . . [A]ppellant[ ] 'has the burden to show that the evidence was not sufficient to support the findings and orders.' [Citation.]" (*Austin J.*, *supra*, 47 Cal.App.5th at p. 885.)

23

Father complains that even though he informed DCFS and the juvenile court that PGM had mentioned that she possibly had Indian ancestry, "[t]here is no evidence that DCFS asked her about Indian ancestry during any of [the agency's] contacts" with her. Because father seems to argue that DCFS's obligation to interview PGM arose because of the information he provided to the agency, father seems to contend that it failed to discharge the duty of further inquiry. (See *T.G.*, *supra*, 58 Cal.App.5th at p. 291 [indicating that a social worker must conduct further inquiry if the worker obtains information giving him or her " 'reason to know or believe' " the minor is or may be an Indian child].) For the reasons set forth below, we reject father's claim that DCFS did not make an adequate inquiry under ICWA when it failed to interview PGM about J.R.'s Indian status.

The August 3, 2020 detention report indicates that during the first few occasions in which DCFS personnel encountered PGM, father was present. This is significant because father had told the agency that he did not want PGM involved in the case. A social worker reported that when the worker greeted PGM on two of those occasions, she did not respond to that greeting. Further, DCFS personnel reported that when they encountered PGM in July 2020, she repeatedly said to them, " 'I will not provide you with any information[,]' " and she did not respond to the social workers' questions. Because DCFS need not interview a relative who "refuse[s] to talk to" the agency, substantial evidence supports the juvenile court's implied finding that DCFS fulfilled its duty of further inquiry. (See *A.M.*, *supra*, 47 Cal.App.5th at p. 323.) Furthermore, we reject father's argument that "the juvenile court [also]. . . failed to meet [its] ongoing duties under ICWA" because this appellate claim appears to be premised solely

24

on his contention that DCFS should have interviewed PGM.  (See *Austin J., supra,* 47 Cal.App.5th at p. 885 ["[A]ppellant[ ] 'has the burden to show that the evidence was not sufficient to support the findings and orders.'  [Citation.]"].)

## DISPOSITION

We affirm the juvenile court's orders sustaining the supplemental petition, removing J.R. from his parents' custody, and requiring father to submit to a psychiatric evaluation pursuant to Evidence Code section 730.

NOT TO BE PUBLISHED.

BENDIX, J.

We concur:

ROTHSCHILD, P. J.

CHANEY, J.